2007 ND 144

**Willis H. PETERSON, Patricia K. Peterson, and E–Z UZ Products, Inc., Plaintiffs and Appellants,**

v.

**DAKOTA MOLDING, INC., a Corporation, Defendant,**

v.

**National Fire Insurance Company of Hartford, a Corporation, Garnishee and Appellee.**

No. 20060356.

Supreme Court of North Dakota.

Aug. 30, 2007.

Leland F. Hagen (argued), Lee Hagen Law Office, Ltd., and Fallon M. Kelly (on brief), Jones and Kelly, P.C., Lisbon, N.D., for plaintiffs and appellants.

Christopher R. Carroll (argued), Carroll, McNulty & Kull, L.L.C., Basking Ridge, N.J., and Curtis L. Wike (appeared), Fleck, Mather & Strutz, Bismarck, N.D., for garnishee and appellee.

MARING, Justice.

[¶ 1] Willis H. Peterson, Patricia K. Peterson, and E–Z UZ Products, Inc. ("Petersons") appeal from a district court order denying their motion for leave to file a supplemental complaint joining National Fire Insurance Co. of Hartford ("National Fire") as a garnishee. We conclude the district court did not err in denying the Petersons' motion to join National Fire as a garnishee to the action because the National Fire commercial general liability ("CGL") policy's exclusions eliminate coverage for damages to the insured's work and product. We affirm.

I

[¶ 2] The Petersons are owners of E–Z UZ Products, Inc., and invented and designed the E–Z UZ funnel product. The product is a two-gallon polyethylene funnel which includes a threaded brass fitting secured to the end of the funnel, allowing the funnel to be screwed into the top of a larger drum. Dakota Molding, Inc. ("Dakota Molding") is in the business of molding or manufacturing plastic or polyethylene products.

[¶ 3] In 1998, the Petersons entered into an agreement with Dakota Molding to manufacture the funnel in accordance with the Petersons' specifications. The Petersons required a tight bond between the brass fitting and plastic funnel. Despite this specification, the Petersons began receiving complaints that the funnels were failing at the bond.

[¶ 4] The Petersons investigated the complaints and discovered, contrary to their specifications, Dakota Molding had failed to "square off" the end of the brass fittings. Although the Petersons and Dakota Molding attempted to fix the manufacturing problem, the Petersons continued receiving complaints, resulting in their inability to sell the funnels and termination of various distribution contracts. The Petersons brought an action against Dakota Molding seeking in part their economic loss as a result of terminated distribution contracts based upon Dakota Molding's defective manufacturing.

[¶ 5] The Petersons subsequently amended their complaint to allege damage to their property, asserting in part they had supplied certain component parts of the funnels which, as a result of their inability to sell the funnels, could not be repaired, restored, or reused. The Petersons and Dakota Molding entered into a *Miller v. Shugart* settlement agreement and release, in which Dakota Molding agreed to pay the Petersons $35,000 and allow entry of judgment against Dakota Molding in the amount of $1,519,420, on the condition that recovery would be collected only from the proceeds of the CGL policy issued by National Fire to Dakota Molding. *See Sellie v. North Dakota Ins. Guar. Ass'n,* 494 N.W.2d 151 (N.D.1992); *Miller v. Shugart,* 316 N.W.2d 729 (Minn. 1982).

[¶ 6] The Petersons' claim against Dakota Molding had previously been submitted to National Fire, but National Fire declined to defend Dakota Molding and, further, denied the claim. National Fire maintained there was no coverage under the CGL policy because the defective manufacturing and economic losses were not "occurrences" under the policy. National Fire also asserted one or more exclusions contained in the policy operated to preclude coverage of the claim.

[¶ 7] After judgment was entered against Dakota Molding, the Petersons moved the district court for leave to file a supplemental complaint against National Fire, making National Fire a party to the action as garnishee and seeking judgment in the amount of $1,519,420. In its October 2006 order, the district court denied the Petersons' motion. In denying the Petersons' motion for leave to file a supplemental complaint, the district court analyzed the CGL policy at issue and concluded there was no coverage and, therefore, no probable cause for Petersons' motion to be granted.

[¶ 8] The Petersons appeal from the district court's order denying their motion for leave to file a supplemental complaint to name National Fire as a garnishee in their action against Dakota Molding.

II

[¶ 9] In the garnishment proceeding under N.D.C.C. § 32–09.1–12, where a garnishee denies liability, the plaintiff "may move the court . . . for leave to file a supplemental complaint making the garnishee a party to the action, and setting forth the facts upon which the plaintiff claims to charge the garnishee. If probable cause is shown, the motion shall be granted." In *Medd v. Fonder,* 543 N.W.2d 483, 486 (N.D.1996) (quotations omitted) (emphasis added), this Court defined the "probable cause" requirement contained in N.D.C.C. § 32–09.1–12:

Probable cause in this type of proceeding has been defined as some showing by evidence *which fairly and reasonably tends to show the existence of the facts alleged.* The question whether probable cause has been shown depends on whether the evidence shows probable grounds for believing that the garnishee

*might be held liable* under the policy involved here.

[¶ 10] In this case, the district court concluded that National Fire's CGL policy with Dakota Molding did not provide coverage and, therefore, no "probable cause" existed for Petersons' motion to be granted. Therefore, the issues raised in this appeal involve the interpretation of National Fire's CGL policy, which is a question of law fully reviewable on appeal. *ACUITY v. Burd & Smith Constr., Inc.,* 2006 ND 187, ¶ 7, 721 N.W.2d 33. This Court independently examines and construes an insurance contract to determine whether there is coverage. *Fisher v. American Family Mut. Ins. Co.,* 1998 ND 109, ¶ 5, 579 N.W.2d 599.

> "[A] term in an insurance policy should be construed 'to mean what a reasonable person in the position of the insured would think it meant.'" "Limitations or exclusions from broad coverage must be clear and explicit." "[W]hen the language of an insurance policy is clear and explicit, the language should not be strained in order to impose liability on the insurer." However, any ambiguity or reasonable doubt as to the meaning of an insurance policy is strictly construed against the insurer and in favor of the insured. "If the language in an insurance contract will support an interpretation which will impose liability on the insurer and one which will not, the former interpretation will be adopted." Exclusions from broad coverage in an insurance policy are strictly construed against the insurer.

*Id.* at ¶ 6 (citations omitted). "We construe insurance contracts as a whole to give meaning and effect to each clause, if possible. The whole of a contract is to be taken together to give effect to every part, and each clause is to help interpret the others." *State v. North Dakota State*

*Univ.,* 2005 ND 75, ¶ 12, 694 N.W.2d 225 (citations omitted).

### III

[¶ 11] The National Fire CGL policy with Dakota Molding which is at issue in this case provides, in part:

SECTION I—COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply....

   b. This insurance applies to "bodily injury" and "property damage" only if:

   (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

   (2) The "bodily injury" or "property damage" occurs during the policy period.

   ....

2. Exclusions

   This insurance does not apply to:

   ....

   k. Damage To Your Product

   "Property damage" to "your product" arising out of it or any part of it.

   l. Damage To Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

. . . .

## SECTION V.—DEFINITIONS

. . . .

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

. . . .

20. "Your product" means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(1) You;

(2) Others trading under your name; or

(3) A person or organization whose business or assets you have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

b. The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

21. "Your work" means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

b. The providing of or failure to provide warnings or instructions.

### IV

[¶ 12] Under the CGL policy, coverage may be triggered in the event of an "occurrence" that results in "property damage." "Occurrence" and "property damage" are defined terms in the policy. In this case, the district court concluded that the facts alleged in the underlying lawsuit are sufficient to meet the definition of "occurrence," but concluded that exclusions (k), (*l*), and (m) preclude coverage. The district court thus denied Petersons' motion for leave to file a supplemental complaint against National Fire as garnishee.

[¶ 13] On appeal, National Fire does assert, as an alternative ground for affirm-

ing the district court, that the underlying lawsuit does not allege an "occurrence." We do not address, however, the court's conclusion that there is an "occurrence" under the CGL policy. For purposes of this appeal, we will assume without deciding that the facts alleged in the underlying lawsuit constitute an "occurrence" because we hold the application of the policy exclusions (k) and (*l*) is dispositive. *Cf. Ernst v. Acuity*, 2005 ND 179, ¶ 11, 704 N.W.2d 869; *Plasticert, Inc., v. Westfield Ins. Co.*, 923 A.2d 489, 493 (Pa.Super.2007).

[¶ 14] Exclusion (k) in the CGL policy is also known as the "your product" exclusion, and exclusion (*l*) is also known as the "your work" exclusion. Specifically, the CGL policy in this case states: "This insurance does not apply to: ... k. 'property damage' to 'your product' arising out of it or any part of it .... *l*. 'property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" These exclusions preclude coverage in situations where an insured seeks coverage for property damage to its product or work.

[¶ 15] Petersons assert this Court's decisions in *Fisher*, 1998 ND 109, 579 N.W.2d 599, and *ACUITY*, 2006 ND 187, 721 N.W.2d 33, support its contention that these exclusions do not apply to exclude coverage for the alleged damage to the brass inserts and various other parts and equipment that Petersons provided to Dakota Molding in the manufacturing process.

[¶ 16] In *Fisher*, the insured was a contractor hired by a homeowner to sand and apply a polyurethane finish to flooring supplied and installed by other contractors. 1998 ND 109, ¶ 2, 579 N.W.2d 599. Within months, gaps had appeared in sections of the flooring and individual boards began splitting. *Id.* at ¶ 3. In the homeowner's ensuing litigation, the insured contractor was subsequently named as a third-party defendant and submitted the suit to its insurer, which denied coverage. *Id.* The parties to the lawsuit then entered into a *Miller v. Shugart* settlement, in which the contractor that had sanded and finished the flooring assigned its rights against its insurer to the homeowner. *Id.* In granting summary judgment for the insurer, the district court concluded the coverage under the policy was precluded by exclusions in the policy. *Id.* at ¶ 4. This Court, however, reversed the district court, holding that the insurer was liable for the repair and replacement of the flooring, but based on the application of exclusions (k) and (*l*), the cost of the finish and the sanding and finishing performed by the insured were excluded from coverage. *Id.* at ¶¶ 15–18.

[¶ 17] In *ACUITY*, the insured was a construction company that had contracted with the owners of an apartment building to replace the building's roof. 2006 ND 187, ¶ 2, 721 N.W.2d 33. The building owners, including two tenants who had sustained property loss due to water damage, subsequently claimed that the insured had failed to protect the apartment building from rainstorms while replacing the roof, which caused extensive damage to the interior of the building. *Id.* The insurer commenced a separate action, seeking a declaration that the insured's CGL policy did not provide coverage for the damages in the underlying action. *Id.* at ¶ 4.

[¶ 18] On appeal, this Court concluded that any damages for repair or replacement of the defective roof were excluded from coverage under the CGL policy, but that damages to the apartment's interior were not the "particular part" of the real property or any property as contemplated by exclusions k(5) and k(6). *ACUITY*, 2006 ND 187, ¶ 27, 721 N.W.2d 33. We thus held that the damages to the apartment building's interior were not excluded

from coverage under the policy's exclusions.

[¶ 19] Although in the context of applying exclusions k(5) and k(6), we explained in *ACUITY*:

> [O]ther courts have generally construed those property damage exclusions to exclude coverage when the property damage is to the property on which the insured has contracted to perform operations and not to exclude coverage when the property damage is to property that the insured was not performing operations on. Some courts have specifically recognized that facts in each case are determinative of the particular part of property on which an insured is performing its operations and that buildings may be divided into parts in attempting to determine which part or parts are the object of the insured's work product. A common thread for deciding whether there is coverage for property damage is the scope of the insured's contract.

2006 ND 187, ¶ 24, 721 N.W.2d 33 (citations omitted); *See also Ernst*, 2005 ND 179, ¶ 11, 704 N.W.2d 869 (concluding "business risk" exclusion k(5) precluded coverage for insured's improper installation of flooring).

[¶ 20] As discussed in 3 Rowland H. Long, *The Law of Liability Insurance* § 11.09[2] (2007), the injury to products or work exclusions' purpose "is to prevent the insured from using its product liability coverage as a form of property insurance to cover the cost of repairing or replacing its own defective products or work."

> The injury to products or work exclusion is intended to exclude insurance for damage to the insured's product or work, but not for damage caused by the insured's product or work. Thus, the exclusion does not apply where the product or work causes damages to other persons or property. In such a situation, while there would not be coverage for damage to the work or product itself, damages caused by the product to other work or products would be covered.... The injury to work or products exclusion is consistent with the goal of the CGL, which is to protect the insured from the claims of injury or damage to others, but not to insure against economic loss sustained by the insured due to repairing or replacing its own defective work or products. As such, this type of exclusion is valid and enforceable.

3 Long, at ¶ 11.09[2].

[¶ 21] Here, the application of exclusions (k) and (*l*) depends largely upon the extent to which the completed funnels constitute the "product" and the "work" of Dakota Molding, in light of the definitions of the CGL policy. Under the policy, "[y]our product" is defined as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by ... [y]ou ... and [c]ontainers (other than vehicles), material, parts or equipment furnished in connection with such goods or products." "Your work" is defined as "[w]ork or operations performed by you or on your behalf" and "[m]aterials, parts or equipment furnished in connection with such work or operations."

[¶ 22] On appeal, Petersons attempt to downplay the role of Dakota Molding in the manufacturing process and to divide the funnel product, for purposes of the CGL policy analysis, into its component parts, contending "[t]he only part of the funnel provided by [Dakota Molding] was the plastic portion. The brass insert, label, burp tube, strainer, tether, and rivets were supplied by Peterson, and [Dakota Molding] produced the plastic which assembled these parts together." Indeed, Petersons argue that the various component parts, including brass fittings, various

components, and equipment provided to Dakota Molding for purposes of manufacturing the funnel constitute other property such that damage to it would be covered by Dakota Molding's CGL policy. However, the "your product" and "your work" exclusions and the policy's definitions suggest otherwise.

[¶ 23] In applying exclusions (k) and (l), the district court here concluded that Dakota Molding's product and work is the manufacturing of the whole funnel, such that damage to any of the various component parts would not fall outside of the exclusion. The district court correctly distinguished *Fisher* and *ACUITY* from the present case, stating:

> In *Fisher*, [the insured] contracted to provide a specific service of sanding and applying a polyurethane finish to wood already installed, and the Supreme Court limited the scope of [the insured's] work product to those services. In *ACUITY*, the [insured] roofer contracted to install a new roof, and the Supreme Court limited the scope of the roofer's work product to that undertaking."

(Citations omitted.)

[¶ 24] The district court looked to the scope of the Petersons' agreement with Dakota Molding and reviewed the Petersons' complaint, which provide that Petersons made an agreement with Dakota Molding to "manufacture the E–Z UZ Funnels in accordance with the requirements and specifications of the Petersons." The court concluded that Dakota Molding's work product was the production of the polyethylene cone used in the funnel and the assembly of the entire funnel. The court explained the Petersons' alleged damages stem from Dakota Molding's "failure to square up the funnels—in other words, [Dakota Molding] failed to assemble the funnels properly."

[¶ 25] We conclude the district court's analysis properly included consideration of the Petersons' contract with Dakota Molding for purposes of determining the scope of Dakota Molding's product and work. *See ACUITY*, 2006 ND 187, ¶ 24, 721 N.W.2d 33 (stating "[a] common thread for deciding whether there is coverage for property damage is the scope of the insured's contract").

[¶ 26] Dakota Molding's product and work involved not only providing the plastic portion of the funnel, but also involved the manufacturing of the completed funnel product, and consequently included any material, parts or equipment furnished in connection with its goods or products or with its work or operations. Based upon the policy's definitions, Dakota Molding's product and work included all of the various parts and assembly of the funnel. As such, we conclude exclusions (k) and (l) apply, precluding coverage by Dakota Molding's CGL policy to the Petersons' alleged damages. To otherwise hold would effectively convert Dakota Molding's CGL policy into a performance bond or guarantee of contractual performance, resulting in coverage for the repair or replacement of Dakota Molding's own faulty workmanship.

[¶ 27] Because we conclude exclusions (k) and (l) clearly exclude coverage for the underlying claim, on this record, as a matter of law, no factual issues meet the burden under *Medd v. Fonder*, 543 N.W.2d 483 (N.D.1996). We, therefore, affirm the district court's order concluding Petersons failed to demonstrate probable grounds for believing National Fire might be liable under its CGL policy for its damages, and denying Petersons' motion for leave to file a supplemental complaint against National Fire as garnishee.

[¶ 28]   In light of our disposition, we have considered the Petersons' remaining issues and conclude they either lack merit or are unnecessary to our decision. *See City of Bismarck v. Witzke*, 2005 ND 170, ¶ 2, 709 N.W.2d 21.

[¶ 29]   The district court order is affirmed.

[¶ 30] GERALD W. VANDE WALLE, C.J., and DANIEL J. CROTHERS, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.