2005 ND 75

**STATE of North Dakota, by and through the STATE FIRE AND TORNADO FUND OF THE NORTH DAKOTA INSURANCE DEPARTMENT, Plaintiff, Counterclaim Defendant, Crossclaim Defendant, and Appellee,**

v.

**NORTH DAKOTA STATE UNIVERSITY, Defendant, Counterclaimant, Third–Party Plaintiff, and Appellant,**

v.

**Hartford Steam Boiler Inspection and Insurance Company, Third–Party Defendant, Crossclaimant, and Appellee.**

No. 20040228.

Supreme Court of North Dakota.

April 6, 2005.

Leo F.J. Wilking, Special Assistant Attorney General, Nilles, Hansen & Davies,

Ltd., Fargo, N.D., for State Fire and Tornado Fund of the North Dakota Insurance Department.

Sara Gullickson McGrane, Felhaber Larson Fenlon Vogt, Minneapolis, MN, for North Dakota State University.

Terrence R. Joy (argued), Robins, Kaplan, Miller & Ciresi, L.L.P., Michael P. McNamee (appeared), Meagher & Geer, P.L.L.P., Minneapolis, MN; and W. Todd Haggart (appeared), Vogel Law Firm, Fargo, N.D., for Hartford Steam Boiler Inspection and Insurance Company.

SANDSTROM, Justice.

[¶ 1] North Dakota State University ("NDSU") appealed from a judgment dismissing its claims against the State Fire and Tornado Fund of the North Dakota Insurance Department ("Fund") and Hartford Steam Boiler Inspection and Insurance Company ("Hartford") to collect insurance proceeds for water damage to various campus structures following a June 2000 rainstorm. We conclude the district court correctly ruled, as a matter of law, the insurance policies in question did not provide NDSU coverage for the claimed water damage. We affirm.

I

[¶ 2] During the evening and early morning hours of June 19 and 20, 2000, a severe rainstorm struck the Fargo area, dumping approximately seven inches of rain during a seven-hour period. By the time the rainfall stopped at about 2 a.m. on June 20, a large amount of water, waist-deep in some places, had accumulated in and around NDSU's campus. The Fargo-Dome is not owned by NDSU, but the facility is located near the campus and is connected to NDSU's heating plant and Industrial Agriculture and Computer Center ("IACC") by a 4,295 foot-long steam

tunnel. Water on the surface of the ground outside of the FargoDome began cascading through its loading dock doors, and by 4 a.m. on June 20, more than eight feet of water covered its floor. At about 11 a.m. on June 20, NDSU employees who were inspecting the steam tunnel heard a surge of water in the tunnel coming from the direction of the FargoDome and exited the tunnel. The heating plant and the IACC received significant amounts of water through the steam tunnel, and consultants concluded the "floodwater in the FargoDome contributed significantly to the flooding in the Heating Plant and the IACC."

[¶ 3] NDSU also suffered water damage to its underground direct buried steam line, which branches off from the main steam line in the steam tunnel and supplies steam to many of NDSU's buildings. The direct buried steam lines are connected every 200 feet by ten-foot by ten-foot concrete vaults. The steam line between each vault is buried three to four feet below the surface of the ground. The vaults are accessed through manhole covers on the concrete ceilings of the vaults, which are two inches above ground level. Moisture entered the insulation of the direct buried steam line system, wearing away the insulation and causing the lines to fail.

[¶ 4] NDSU submitted claims for coverage to their insurers, the Fund and Hartford. The insurers denied coverage, claiming the water damage was excluded by the flood and surface water exclusions included in their respective policies. In February 2002, the Fund filed a declaratory judgment action against NDSU, seeking a declaration that its property insurance policy did not cover NDSU's claim for losses. NDSU filed a counterclaim for coverage against the Fund and filed a third-party claim against Hartford for coverage under its policy. Hartford cross-claimed against the Fund for contribution or indemnity.

[¶ 5] The parties filed cross-motions for summary judgment. The district court granted summary judgment in favor of Hartford regarding NDSU's claim for damages to its steam tunnel, the IACC and the direct buried steam line, and in favor of the Fund regarding the claim for damages to the heating plant and the IACC. The court ruled as a matter of law that the respective insurance policies did not cover the water damage to the steam tunnel, the heating plant, the IACC and the direct buried steam line because of surface water exclusions contained in the policies. After the parties settled NDSU's other claims against the insurers, the court entered a final judgment.

[¶ 6] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. §§ 32–23–01 and 27–05–06. NDSU's appeal is timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. §§ 32–23–07 and 28–27–01.

II

[¶ 7] NDSU argues the district court erred in granting summary judgment in favor of the Fund and Hartford.

[¶ 8] The standard of review for summary judgments is well established. In *Zuger v. State*, 2004 ND 16, ¶ 7, 673 N.W.2d 615 (citations omitted), we explained:

> Summary judgment is a procedural device for promptly disposing of a lawsuit without a trial if there are no genuine issues of material fact or inferences which can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law.

"Whether summary judgment was properly granted is 'a question of law which we review de novo on the entire record.'" On appeal, this Court decides if the information available to the trial court precluded the existence of a genuine issue of material fact and entitled the moving party to summary judgment as a matter of law. Summary judgment is appropriate against parties who fail to establish the existence of a factual dispute on an essential element of a claim on which they will bear the burden of proof at trial.

Mere speculation is not enough to defeat a motion for summary judgment, and a scintilla of evidence is not sufficient to support a claim. *Id.* at ¶ 8.

A

[¶ 9]   NDSU contends the court erred in ruling the surface water exclusions in the insurers' policies applied and precluded its claim for water damage to the steam tunnel, the heating plant, and the IACC.

[¶ 10]   The Fund's insurance policy provides for a maximum aggregate payout of $10,000 for flood damage per occurrence and provides:

B.   EXCLUSIONS

1.   We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

    . . . .

g.   Water

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

[¶ 11]   Hartford's policy similarly provided:

B.   EXCLUSIONS

1.   We will not pay for loss or damage caused by or resulting from:

. . . .

d.   Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not.

[¶ 12]   Interpretation of an insurance contract is fully reviewable on appeal and is a question of law for a court to decide, so we independently examine and construe the insurance contract to determine whether the district court erred in its construction. *Grinnell Mut. Reinsurance Co. v. Lynne*, 2004 ND 166, ¶ 20, 686 N.W.2d 118. In *Ziegelmann v. TMG Life Ins. Co.*, 2000 ND 55, ¶ 6, 607 N.W.2d 898 (citations omitted), we summarized the standards for construing an insurance contract:

Our goal when interpreting insurance policies, as when construing other contracts, is to give effect to the mutual intention of the parties as it existed at the time of contracting. We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction. "If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the contract." While we regard insurance policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage. We will not strain the definition of an undefined term to provide coverage for the insured. We construe insurance contracts as a whole to give meaning and effect to each clause, if possible. The whole of a contract is to be taken together to give

effect to every part, and each clause is to help interpret the others.

[¶ 13] Exclusions from coverage in an insurance contract must be clear and explicit and are strictly construed against the insurer. *Nationwide Mut. Ins. Cos. v. Lagodinski,* 2004 ND 147, ¶ 9, 683 N.W.2d 903. Although we construe exclusionary provisions strictly, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage. *Id.*

[¶ 14] Because the term "surface water" is not defined in the policy, we look to its plain and ordinary meaning. In 5 Appleman, *Insurance Law and Practice* § 3145, at p. 463 (1970) (footnote omitted), "surface water" is described as:

> water which is derived from falling rain or melting snow, or which rises to the surface in springs, and is diffused over the surface of the ground, while it remains in such diffused state, and which follows no defined course or channel, which does not gather into or form a natural body of water, and which is lost by evaporation, percolation, or natural drainage.

*See also Heller v. Fire Ins. Exch.,* 800 P.2d 1006, 1008–09 (Colo.1990) (footnotes omitted) ("Surface water is water from melted snow, falling rain, or rising springs, lying or flowing naturally on the earth's surface, not gathering into or forming any more definite body of water than a mere bog, swamp, slough, or marsh, and lost by percolation, evaporation or natural drainage. Surface water is distinguished from the water of a natural stream, lake, or pond, is not of a substantial or permanent existence, has no banks, and follows no defined course or channel"); *Smith v. Union Auto. Indem. Co.,* 323 Ill.App.3d 741, 257 Ill.Dec. 81, 752 N.E.2d 1261, 1267 (2001) ("Generally, the cases define 'surface water' as water that (1) derives from natural precipitation such as rain or melting snow; (2) flows over or accumulates on the surface of the ground; and (3) does not form a definite body of water or follow a defined watercourse"); *State Farm Lloyds v. Marchetti,* 962 S.W.2d 58, 61 (Tex.App.1997) ("'Surface water' is defined as water or natural precipitation diffused over the surface of the ground until it either evaporates, is absorbed by the land, or reaches channels where water naturally flows"). The cases consistently characterize "surface water" as having a terranean nature "which does not form a well-defined body of water—as opposed to water below the surface, whether from a natural or unnatural source." *Marchetti,* 962 S.W.2d at 61. *Compare Western Nat'l Mut. Ins. Co. v. University of North Dakota,* 2002 ND 63, ¶ 10, 643 N.W.2d 4 ("Other courts have . . . recognized flood water has a terranean nature for water overflowing its natural banks as opposed to water below the surface").

[¶ 15] Although the definition of surface water varies little in the case law, courts have had difficulty applying the definition to particular sets of facts. The parties and the district court focused on *Heller, Marchetti,* and *Smith* in analyzing whether the water that caused damage to the steam tunnel, the heating plant, and the IACC constituted "surface water" within the meaning of the exclusion provisions. NDSU relied on *Heller* and *Marchetti.* The insurers relied on *Smith.*

[¶ 16] In *Heller,* 800 P.2d at 1007, the homeowners discovered that water from spring runoffs of melted snow had caused extensive damage to their property because the regular path of the water had been diverted onto their property by three parallel trenches, "fifteen to twenty feet long, three feet wide, six inches deep, and lined with plastic sheets, rocks and tree limbs." The trenches had been construct-

ed behind the homeowners' property by an "unknown person, or persons," and the homeowners' property had never been affected before by spring runoffs during the homeowners' ten-year occupancy. *Id.* The court concluded the surface water exclusion did not preclude coverage:

> Here, the water originated from natural runoff of melted snow, but was diverted into man-made trenches that were fifteen to twenty feet long and six inches deep. The trenches diverted the regular path of the melted snow over a natural ridge. These trenches were "defined channels" that diverted the regular flow of the water, preventing "percolation, evaporation, or natural drainage." In examining the characteristics of the water that damaged the Hellers' property, we conclude that the runoff lost its character as surface water when it was diverted by the trenches and therefore was not within the surface water exclusion contained in the Hellers' policy.

*Id.* at 1009.

[¶ 17] In *Marchetti*, 962 S.W.2d at 59, the homeowners sought coverage for their home and its contents "as a result of the backup of water and raw sewage through a drain opening in the utility room of their home" after heavy rains. The court ruled the surface water exclusion did not preclude coverage:

> [T]he fact that excessive surface water may have initiated the chain of events which led to appellees' loss is immaterial. Here, excessive rainfall caused the sanitation sewer system to exceed its capacity and direct waters back through the underground lines from the street into appellees' home, in turn, causing non-flood water and sewage to accidently discharge or overflow from within the plumbing system in their home. We hold that when the loss is a consequence

of the invasion of the insured premises by non-flood water, even though the invasion may have been proximately caused by flood water, the exclusion does not apply.

*Id.* at 61.

[¶ 18] In *Smith*, 257 Ill.Dec. 81, 752 N.E.2d at 1263, a storm deluged northeastern Illinois with 17 inches of rain during a 24–hour period. The window wells in the basement of the homeowners' home filled with water, causing the windows to break and the basement to fill with five feet of water. *Id.* The evidence established that the water that entered the homeowners' residence " 'was rain water or water on land whose natural absorption was prevented by and/or whose flow was altered and diverted from its natural flow by manmade objects and constructions to the east of the insured premises, including without limitation streets, other paved surfaces, houses and associated construction and landscaping.' " *Id.* at 1265. The homeowners argued the water was not "surface water," because "the term refers to water flowing naturally whose flow has not been altered in any way by man-made structures." *Id.* at 1266. After citing *Heller*, *Marchetti*, and other cases for the definition of surface water, the court concluded the surface water exclusion precluded coverage:

> We note that none of these cases defines "surface water" as water whose flow has not been affected in any way by human construction. While some of the cases refer to "natural drainage," or water "flowing naturally," those terms are used to distinguish surface water from water in a defined watercourse or a lake or pond. There is no indication in the case law that "naturally" should be interpreted to mean completely untouched or unaffected by man-made structures. It seems to us that if we did adopt

plaintiffs' proposed definition, it would be nearly impossible for surface water to exist, given the highly developed state of our society and the fact that few places without roads or other man-made structures exist today. This causes us to conclude that plaintiffs' proposed definition of "surface water" does not reflect the popular and ordinary meaning of the term. The average reasonable person would not limit surface water to water whose flow has not been altered in any way by paved surfaces, buildings, or other structures.

*Id.* at 1267.

[¶ 19] The court in *Smith*, 257 Ill.Dec. 81, 752 N.E.2d at 1267, also distinguished the *Heller* case, noting the "[*Heller*] court did not hold that water whose flow was altered in any way by a man-made object ceased to be surface water; rather, that distinction was lost only when the water became part of defined channels." The court declined to define surface water so broadly, and concluded that "surface water means water derived from natural precipitation that flows over or accumulates on the ground without forming a definite body of water or following a defined watercourse." *Id.* at 1268. The court held that under this definition, the water that damaged the homeowners' residence was surface water as a matter of law:

It was undisputed that the water that entered plaintiffs' basement was in part rainwater or runoff that accumulated as a result of a torrential rainstorm. There was no evidence that the water emptied into plaintiffs' basement from a defined waterway or channel. Accordingly, we agree with the trial court that there was no genuine issue of material fact as to whether the water in plaintiffs' basement met the definition of "surface water." Therefore, Union was entitled

to judgment as a matter of law under the policy's water damage exclusion. *Id.*

[¶ 20] NDSU analogized the entry of water into the FargoDome, and several hours later, the surge of water from the FargoDome through the steam tunnel and into the heating plant and the IACC, to the water that lost its status as surface water by flowing into underground sewer lines in *Marchetti*, and to the water that lost its character as surface water by being artificially diverted by trenches before damaging the homeowners' property in *Heller*. NDSU also argued *Smith* is distinguishable because, although the FargoDome is analogous to the window well in *Smith*, "NDSU does not own or maintain the FargoDome, and it is not seeking coverage for damages caused to the Fargo-Dome." The district court rejected NDSU's arguments:

Similar to the *Smith* case, this Court finds that the water that entered the FargoDome was surface water. Prior to entering the FargoDome, the rainwater accumulated in the Fargo area without forming a definite body of water. The subsequent traverse into the Steam Tunnel did not change the water's character by following a defined watercourse, in part because the Steam Tunnel was never meant to carry water, unlike the trenches in *Heller*. It would be no different than if surface water had entered the first floor of a house and percolated into the basement through a stairwell. It would be absurd to classify a stairwell as a channel, or that the water's character had changed from surface water to water within a system. In the same fashion water entering the Steam Tunnel did not change the character of the surface water which inundated the FargoDome. NDSU's argument prompts the quote, "An insured

may not avoid a contractual exclusion merely by affixing an additional label or separate characterization to the act or event causing the loss." *Kish [v. Insurance Co. of North America]*, 125 Wash.2d 164, 883 P.2d 308, 311 (1994).

[¶ 21] We agree with the district court's analysis, which finds further support in a factually similar recent decision of the Texas Court of Appeals, which decided the *Marchetti* case. In *Valley Forge Ins. Co. v. Hicks Thomas & Lilienstern, L.L.P.,* —— S.W.3d ——, ——, 2004 WL 2903521, *1 (Tex.App.2004), heavy rains from a tropical storm caused a bayou to overflow its banks and flood the downtown Houston area. According to the court, "[w]ater rushed into the Albert Thomas Convention Center, broke through an interior basement wall of that building, flowed into a downtown parking garage, then into the pedestrian tunnel system, and finally poured into the Bank of America building," damaging the electrical equipment that supplied power to the entire building. *Id.* A law firm located in the Bank of America building was forced to relocate to an alternate interim location, and the law firm sought coverage under its insurance policy for lost business income and extra expenses. *Id.* The insurance policy, however, excluded "losses due to flood, surface water, overflow of any body of water, or from water under the ground surface." *Id.* The court distinguished *Marchetti*, in which "the composition of the water itself was altered ... [by] combining with sewage," and concluded coverage was excluded:

> Tropical Storm Allison deluged the area with rain, creating a large amount of surface water and causing Buffalo Bayou to overflow its banks. Once the water entered the convention center, it behaved as strong waters behave—it caved in an interior wall and rushed onward. It did not back up into a sewer line, cause a water main to burst, commingle with water from an underground swimming pool, or otherwise change or dilute its nature. It simply flowed onward, as flood and surface water is wont to do, obeying the law of gravity and flowing into man-made underground structures. The law firm's loss was caused by a combination of flood and surface water; accordingly, the loss was excluded under the terms of the policy.

*Id.* at *4.

[¶ 22] We agree with the implicit recognition of the court in *Valley Forge* that ownership of water-inundated facilities does not impact the surface water analysis and that surface water does not lose its character as surface water simply by being artificially channeled underground. NDSU does not claim the steam tunnel was built for the purpose of channeling water and does not claim the water mixed with sewage or anything else before damaging the steam tunnel, the heating plant, and the IACC. As in *Valley Forge*, 2004 WL 2903521, *4, once the water entered the FargoDome, "[i]t simply flowed onward, as flood and surface water is wont to do, obeying the law of gravity and flowing into man-made underground structures." We conclude the district court did not err in ruling as a matter of law that the water that damaged these structures was surface water and did not lose its character as surface water by being diverted underground through man-made structures.

[¶ 23] NDSU also argues the district court erred in failing to apply the efficient proximate cause analysis to its claim for coverage for its steam tunnel, heating plant, and the IACC. In *Western*, 2002 ND 63, ¶ 20, 643 N.W.2d 4, this Court concluded "North Dakota has statutorily adopted the efficient proximate cause doc-

trine, and a property insurer may not contractually preclude coverage when the efficient proximate cause of a loss is a covered peril." The efficient proximate cause doctrine is "the universal method for resolving coverage issues involving the occurrence of covered and excluded perils." *Id.* at ¶ 17. The efficient proximate cause " 'is not necessarily the last act in the chain of events, nor necessarily is it the triggering cause,' and the efficient proximate cause 'look[s] to the quality of the links and the chain of causation' and 'is considered the predominating cause of the loss.' " *Id.* at ¶ 32. *Western* involved water damage to campus buildings at the University of North Dakota during the 1997 flood in Grand Forks. During the flood, the City shut down two lift stations, after which water entered campus buildings through the sewer system, causing extensive damage. Because "[t]here was evidence sewer backup could have occurred separately and independently of the flood and could have caused damage without the flood," we reasoned "the flood and sewer backup were both part of the chain of causation for UND's property damage," and concluded the jury was entitled to determine "the flood was not the efficient proximate cause of UND's property damage." *Id.* at ¶ 33.

■ [¶ 24] NDSU contends the court failed to consider all of the events in the chain of causation leading to water entering and damaging the steam tunnel, the heating plant, and the IACC. According to NDSU, there were four "link[s]" in the "chain of causation" in this case: (1) the "rain"; (2) the "accumulation of surface water that occurred on and around the NDSU campus"; (3) the "water diversion into the basement of the FargoDome, which could not be flood or surface water"; and (4) the "non-excluded water that suddenly entered NDSU's otherwise dry, underground Steam Tunnel." NDSU claims,

at the very least, a jury should have been allowed to determine which of these events was the efficient proximate cause.

[¶ 25] In *Kish v. Insurance Co. of North America*, 125 Wash.2d 164, 883 P.2d 308, 311 (1994), the court explained:

> The efficient proximate cause rule applies only where two or more independent forces operate to cause the loss. "When, however, the evidence shows the loss was in fact occasioned by only a single cause, albeit one susceptible to various characterizations, the efficient proximate cause analysis has no application. An insured may not avoid a contractual exclusion merely by affixing an additional label or separate characterization to the act or event causing the loss." *Chadwick v. Fire Ins. Exch.*, 17 Cal. App.4th 1112, 1117, 21 Cal.Rptr.2d 871 (1993).

The court in *Kish*, at 312, concluded rain and flood were not two separate perils for application of the efficient proximate cause doctrine because rain "is a well-recognized and common part of a flood." *See also Pieper v. Commercial Underwriters Ins. Co.*, 59 Cal.App.4th 1008, 69 Cal.Rptr.2d 551, 558 (1997) (arson and brush fire were not separate and distinct perils that caused loss); *Chadwick*, 21 Cal.Rptr.2d at 874 (builder's negligence and defective framing were not separate perils, because "[t]o say builder negligence 'caused' the defective framing is, in this context, to indulge in misleading wordplay"); *Finn v. Continental Ins. Co.*, 218 Cal.App.3d 69, 267 Cal. Rptr. 22, 24 (1990) (leakage and broken pipes were not two distinct and separate perils); 5 E. Holmes, *Holmes's Appleman on Insurance 2d* § 6.2, at p. 185 (1996) (footnote omitted) ("The efficient proximate cause rule does not apply to a loss caused by a discernable cause even though the insured attempts to characterize the

cause in various ways to create the appearance of multiple causes").

[¶ 26] We agree with the district court's resolution of this issue:

In this case there were not two separate or distinct events. The fact that the water took 9 to 10 hours to reach the IACC and Heating Plant is irrelevant. The length of time was merely a result of one continuous flowing of the water. Unlike the *Western National* case, there was nothing like a shut down of sewer lift stations. NDSU merely claims the characterization of the water changed without delineating a separate event.

The undisputed facts establish that surface water, an excluded peril under both insurance policies, was the only cause of water damage to the steam tunnel, the heating plant, and the IACC. We conclude the district court did not err in failing to apply the efficient proximate cause doctrine under these circumstances.

[¶ 27] We have considered NDSU's other arguments concerning the steam tunnel, the heating plant, and the IACC, and we deem them to be without merit. We conclude the district court did not err in ruling as a matter of law that the surface water exclusions in the insurers' policies were applicable and precluded NDSU's claim for water damage to these structures.

B

[¶ 28] NDSU argues the district court erred in granting summary judgment in favor of Hartford regarding its claim for damages to the direct buried steam line because there is a genuine issue of fact whether water that entered the lines through manhole covers or moisture from saturated ground below the surface caused the lines to fail. The court ruled the direct buried steam line was damaged by surface water as a matter of law.

[¶ 29] NDSU acknowledges that surface water infiltrated the direct buried steam line through openings in the manhole covers in the vaults. At one point during his deposition, Bruce Frantz, director of the Physical Plant at NDSU, testified:

Q. So then you talked before during the previous portion of the deposition about water coming in through the vaults, the manhole covers in the vaults.

A. Um-hum.

Q. And that caused the insulation to get wet. How would that have happened physically?

A. Well, the manhole covers are not watertight.

Q. Right.

A. So if water was laying on the surface, water would have gone through the penetrations, because there are openings, generally two or three openings where you can get some kind of bar underneath so you can lift the manhole up. So you've got an opening there.

Q. Right.

A. Plus, where the steel manhole covers sit on the steel manhole ring, it's not watertight, so water would seep in around that also.

Q. So it would fill up in the vault, and then how would that water get actually into the insulation of the piping from inside the vault?

A. Well, the insulation in the vault is exposed, so as water is running down around the lid, it could be dripping on the steampipe and the insulation.

[¶ 30] At another point in his deposition, Frantz testified:

Q. Okay. Let's talk about the steam lines for a second. What is your understanding of the nature of the damage to the direct buried steam lines? How were they damaged?

A. Basically loss of insulating power of the insulation around the line because of the water that got into the clay tile style pipes.

. . . .

Q. And so the insulation became wet when water seeped through the ground from the rain and into the tile pipe insulation, into the tile pipe?

A. *Either through the ground or through the vaults.*

Q. And so water would have entered through—into the vaults and then fallen onto the insulation on the pipes?

A. Well, the vaults were filled with water. Then the pipes that run through the vaults, the water would have gone out laterally to follow the lines.

Q. I see. And so it would have been flush up against the insulation and the insulation would have absorbed the water, causing the insulation to get wet.

A. Correct.

Q. And because the insulation was wet, it wasn't effective in its function.

A. Correct.

(Emphasis added).

[¶ 31] Based on Frantz's statement that the insulation became wet from water "[e]ither through the ground or through the vaults," NDSU argues the court erred in granting summary judgment because this evidence raises a genuine issue of material fact concerning the efficient proximate cause of damage to the direct buried steam line.

[¶ 32] Frantz's testimony, read in total, does not indicate that he believed the damage occurred *either* through subterranean moisture *or* through surface water that had poured into the vaults through the manhole covers. At best, his testimony suggests that Frantz considered the possibility that subterranean moisture and surface water were concurrent causes of the damage. However, a covered peril that is merely a concurrent cause of damage is insufficient to allow coverage under the efficient proximate cause doctrine recognized in North Dakota. In 7 L. Russ & T. Segalla, *Couch on Insurance 3d* § 101:57, at pp. 101–152, 101–153 (1997) (footnotes omitted), the authors explain:

The efficient proximate cause rule allows recovery for a loss caused by a combination of a covered and an excluded risk only if the covered risk was the efficient proximate cause of the loss, meaning that the covered risk set the other causes in motion which, in an unbroken sequence, produced the result for which recovery is sought.... The concurrent cause rule, on the other hand, takes the approach that coverage should be allowed whenever two or more causes do appreciably contribute to the loss, and at least one of the causes is an included risk under the policy.

*See also Paulucci v. Liberty Mut. Fire Ins. Co.,* 190 F.Supp.2d 1312, 1319 (M.D.Fla.2002); *Waldsmith v. State Farm Fire & Cas.,* 232 Cal.App.3d 693, 283 Cal. Rptr. 607, 608 (1991); *Howell v. State Farm Fire and Cas. Co.,* 218 Cal.App.3d 1446, 267 Cal.Rptr. 708, 715–16 (1990); *Cornhusker Cas. Co. v. Farmers Mut. Ins. Co.,* 268 Neb. 168, 680 N.W.2d 595, 601 (2004).

[¶ 33] Viewing Frantz's statement in the light most favorable to NDSU, we conclude it is no more than a scintilla of

evidence insufficient for a reasonable trier of fact to find that subterranean moisture was the efficient proximate cause of the damage to the direct buried steam line. *See Iglehart v. Iglehart*, 2003 ND 154, ¶ 10, 670 N.W.2d 343. The district court did not err in granting summary judgment in favor of Hartford on NDSU's claim for damages to the direct buried steam line.

### III

[¶ 34]   The judgment is affirmed.

[¶ 35] GERALD W. VANDE WALLE, C.J., DONALD L. JORGENSEN, D.J., and MARY MUEHLEN MARING, J., concur.

[¶ 36] The Honorable DONALD L. JORGENSEN, D.J., sitting in place of KAPSNER, J., disqualified.

[¶ 37] The Honorable WILLIAM A. NEUMANN, a member of the Court when this case was heard, resigned effective March 14, 2005, and did not participate in this decision.