YOUNG, D.J.[1]
I. INTRODUCTION
This diversity suit asks this Court to construe two provisions of a Directors &
*780 Officers liability insurance policy (the "D & O Policy") between Security National Insurance Company ("Security National") and H.O.M.E., Inc. ("H.O.M.E."), a closely-held company incorporated under the laws of North Dakota. Security National seeks declaratory relief stating it has no obligation to pay for any costs or losses resulting from the legal defense of H.O.M.E.'s President, Lauris Molbert, in an unrelated suit brought against him by his three siblings. Because the siblings allege their brother acted simultaneously in covered and noncovered capacities, the Court must determine as a threshold matter whether the siblings' suit is covered under the policy, which limits coverage to "insured persons acting solely in their capacity as director [or] officer." If the Court finds coverage it must then decide whether the insurance company is nevertheless exempted from coverage under the policy's exception for suits brought by "any insured person in any capacity." Specifically, the Court must decide whether the siblings' joint claims are excepted given that one of the siblings is also an insured person under the policy.
Because the language of the insurance policy is clear on its face, Security National is entitled to judgment as matter of law. For the reasons stated herein, the Court grants Security National's motion for summary judgment and denies H.O.M.E.'s motion for partial summary judgment.
II. UNDISPUTED FACTS[2]
A. Allegations in the Underlying Litigation Giving Rise to the Instant Action.
Ralph Molbert co-founded H.O.M.E., the parent corporation of Northland Financial (the "Bank") and Northland Insurance Company. Mem. Defs.' Supp. Mot. Partial Summ. J. ("Defs.' Mem.") 2, ECF No. 20; Mem. Supp. Pl.'s Mot. Summ. J. ("Pl.'s Mem.") 3, ECF No. 25. During the 1990s, he began to transfer some of his shares in H.O.M.E., via a stock purchase agreement, to his four children: Lauris Molbert ("Lauris"), Kristi Benz ("Kristi"), Karna Kornkven ("Karna"), and Eric Molbert ("Eric"). Pl.'s Mem. 3; Defs.' Mem. 4. For the past twenty years, Lauris has served as President and a director of H.O.M.E. Pl.'s Mem. 2; Defs.' Mem. 2. Lauris is a licensed attorney in North Dakota and has provided legal advice to the Bank as an independent contractor. Pl.'s Mem. 3; H.O.M.E. Answer & Countercl. ("H.O.M.E. Answer") ¶ 16, ECF No. 6; Compl. ¶ 3; Lauris Molbert Answer & Countercl. ("Molbert Answer") ¶ 16, ECF No. 8. In 2005, Kristi began serving as a director at the Bank. Pl.'s Mem. 3; H.O.M.E. Answer ¶ 4; Molbert Answer ¶ 4.
In 2015, Lauris sued Kristi, Karna, and Eric to enforce a provision in the stock purchase agreement that would allow him to exercise a call option and buy his siblings' shares. Compl. Ex. A., ECF No. 1-1; Defs.' Mem. 4. Kristi, Karna, and Eric jointly filed an answer in which they alleged nine counterclaims against Lauris. Compl. Ex. B, Answer & Countercl. ("Siblings' Countercl.") ECF No. 1-2; Defs.' Mem. 4. The counterclaims form a single docket entry and make no distinction between the counter-claimants. Siblings' Countercl. 15-25; Pl.'s Mem. 5; Defs.' Mem. 4-5. Specifically, the siblings alleged:
1. Fraud related to the stock purchase agreement. Siblings' Countercl. 15.
*781 2. Breach of fiduciary duty as a "shareholder, officer, director, and controller of, and as an attorney representing H.O.M.E." Id. at 16.
3. Breach of fiduciary duty as a Trustee of the Molbert Farms Limited Partnership. Id. at 17.
4. Breach of fiduciary duty as "an attorney providing legal advice" to the siblings. Id. at 19.
5. Breach of fiduciary duty as a Trustee of the Ralph N. Molbert's Family Trust and two marital trusts. Id. at 20.
6. Violation of N.D.C.C. § 10-19.1-115, which prohibits directors from acting "in an unfairly prejudicial manner" toward shareholders. Id. at 21.
7. Violation of N.D.C.C. § 10-19.1-50 by failing to discharge his duties as a director in good faith and in the best interest of the corporation. Id. at 22.
8. Declaratory judgment stating that the Stock Purchase Agreement is not enforceable. Id. at 23.
9. Unjust enrichment for tortious and inequitable conduct. Id. at 24.
All the above claims arise from an event in 1993, in which the siblings allege Lauris presented the stock purchase agreement for them to sign and misrepresented various provisions relating to his ability to exercise the call option on their shares. Id. at 13-14.
B. Undisputed Facts Surrounding Security National's Denial of Liability Insurance Coverage.
In his capacity as President and a director of H.O.M.E., Lauris emailed Security National, H.O.M.E.'s D & O liability insurance provider, to request coverage for the costs of defending him against the siblings' counterclaims. Aff. Counsel Supp. of Security National's Mot. Summ. J. ("Pl.'s Aff."), Ex. 8, ECF No. 26-8; Pl.'s Mem. 6; Defs.' Mem. 5. Security National responded with a letter denying coverage based on the D & O Policy's Insured vs. Insured Exclusion while also reserving the right to deny coverage based on other provisions. Compl., Ex. D, Aug. 10, 2015 Letter from Security National to H.O.M.E. ("Rejection Letter") 10-11, ECF No. 1-4; Pl.'s Mem. 6; Defs.' Mem. 5. The Insured v. Insured Exclusion ("IvI Exclusion") provides that Security National will not be liable to cover "any claim [3] by, on behalf of, or at the behest of ... any insured person in any capacity." Compl., Ex. C, Directors and Officers Liability Insurance Policy ("D & O Policy") 17-18 (Section IV.A.20), ECF No. 1-3. Because directors and officers of H.O.M.E.'s subsidiaries are insured under the Policy, and Kristi was a director at the Bank, Kristi was an insured person under the D & O Policy-a fact that is not contested. Pl.'s Mem. 11; Defs.' Mem. 12. The initial letter denying coverage stated that as an insured person, Kristi's counterclaims against Lauris, who was also an insured person, brought "her claim within the scope of the insured-versus-insured exclusion." Rejection Letter 10.
In correspondences between the parties at the end of 2015, Security National reaffirmed its denial of coverage several times and reserved all rights and defenses with regard to coverage. Pl.'s Aff., Ex. 9, ECF 26-9; Pl.'s Aff., Ex. 10, ECF 26-10; Defs.' Mem. 5. Security National nevertheless agreed to cover some defense costs under an arrangement, the terms of which are currently disputed by the parties. Defs.' Mem. 5; Defs.' Mem. Opp'n Pl.'s Mot. Summ. J. ("Defs.' Opp'n") 3-4, ECF No. 32; Pl.'s Mem. Opp'n Defs.' Partial Mot. Summ. J. ("Pl.'s Opp'n") 3-5, ECF No. 30. Under this contested arrangement, Security National paid, over the course of the following year, around $142,000 in defense costs. Defs.' Mem. 6; Compl. 10.
*782 In a subsequent letter to H.O.M.E., Security National described the coverage arrangement as a "provisional offer to reimburse ... defense costs for the Lawsuit ... as an accommodation to the insureds, and in order to potentially avoid the expense of a declaratory judgment action." Pl.'s Aff., Ex. 11, at 2, ECF 26-11; Pl.'s Mem. 6; Defs.' Mem. 5. Lauris and H.O.M.E. dispute this characterization and argue the arrangement was made pursuant to Security National's obligation under Section VIII.B of the D & O Policy to "pay defense expenses, determined by the Insurer to be part of a covered loss, on a current basis." Defs.' Opp'n 3-4, 24-25. In addition to contesting the extent and nature of this arrangement, the parties dispute whether H.O.M.E. exceeded the agreed upon coverage by hiring a different lawyer and whether Security National withdrew coverage prior to the trial in the underlying litigation. Defs.' Opp'n 3-4; Defs.' Mem. 5 n.1; Pl.'s Opp'n 5.
III. ANALYSIS
A. Legal Framework
1. Standard of Review for Summary Judgment
Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The "interpretation and construction of insurance policies is a matter of law, and therefore, issues involving the duty to defend are particularly amenable to summary judgment." First S. Ins. Co. v. Jim Lynch Enters., Inc., 932 F.2d 717, 719 (8th Cir. 1991) ; John Deere Ins. Co. v. Shamrock Indus., Inc., 929 F.2d 413, 417 (8th Cir. 1991).
The Court is not asked to determine the nature of the temporary coverage arrangement or whether either party breached its obligations under it. Pl.'s Mot. Summ. J., ECF No. 24; Defs.' Partial Mot. Summ. J., ECF No. 19. The Court is tasked only with resolving whether the counterclaims in the underlying litigation give rise to a legal obligation to cover any costs or losses associated with Lauris's legal defense. Pl.'s Mot. Summ. J.; Defs.' Partial Mot. Summ. J.
H.O.M.E. argues "[a]t a minimum, Security National's motion for summary judgment should be denied" to permit discovery "into Security National's drafting intent, internal claims handling manuals and guidelines, and claims-handling intentions in paying over $140,000 in defense costs." Defs.' Opp'n 24. Yet this argument assumes the parties' intent cannot by determined by the "four corners" of the D & O Policy. In North Dakota, "intention of the parties is to be ascertained from the writing alone if possible." N.D. Cent. Code § 9-07-04 (2017). Indeed, "extrinsic evidence is not admissible to alter, vary, explain, or change the contract" if "the parties' intentions can be ascertained from the writing alone." Hallin v. Inland Oil & Gas Corp., 903 N.W.2d 61, 64 (N.D. 2017). "When the parties' intent can be determined from the contract language alone, interpretation of a contract presents a question of law." THR Minerals, LLC v. Robinson, 892 N.W.2d 193, 197 (N.D. 2017) (quoting Border Res., LLC v. Irish Oil & Gas, Inc., 869 N.W.2d 758, 763 (N.D. 2015) ).
Because Security National posits its obligation to defend can be determined based on the unambiguous terms of the D & O Policy, it is entitled to summary judgment if the court can effectuate the parties' intent based on the Policy's language. See Hallin, 903 N.W.2d at 64.
*783 2. General Principles of Insurance Policy Interpretation in North Dakota
The North Dakota Supreme Court has provided extensive guidance on how it interprets insurance policies:
Our goal when interpreting insurance policies, as when construing other contracts, is to give effect to the mutual intention of the parties as it existed at the time of contracting. We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction. "If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the contract." While we regard insurance policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage. We will not strain the definition of an undefined term to provide coverage for the insured. We construe insurance contracts as a whole to give meaning and effect to each clause, if possible. The whole of a contract is to be taken together to give effect to every part, and each clause is to help interpret the others.
Exclusions from coverage in an insurance contract must be clear and explicit and are strictly construed against the insurer. Although [a policy's exclusionary clauses are strictly construed, this Court] will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage.
State v. North Dakota State Univ., 694 N.W.2d 225, 229 (N.D. 2005) (first paragraph quoting Ziegelmann v. TMG Life Ins. Co., 607 N.W.2d 898, 900 (N.D. 2000) ; second paragraph citing Nationwide Mut. Ins. Cos. v. Lagodinski, 683 N.W.2d 903, 907 (N.D. 2004) ). Specifically in the context of construing exceptions to liability insurance policies, it has explained:
[I]n interpreting an insurance policy, we will first examine the coverages provided by the policy before examining a policy's exclusions. If and only if a coverage provision applies to the harm at issue will the court then examine the policy's exclusions and limitations of coverage. An exclusionary provision, or the absence of one, cannot be read to provide coverage that does not otherwise exist. Likewise, although an exception to an exclusion from coverage results in coverage, an exception to an exclusion is incapable of initially providing coverage; rather, an exception may become applicable if, and only if, there is an initial grant of coverage under the policy and the relevant exclusion containing the exception operates to preclude coverage.
K & L Homes, Inc. v. Am. Family Mut. Ins. Co., 829 N.W.2d 724, 728 (N.D. 2013) (citations omitted).
This approach counsels against Security National's invitation to construe the IvI Exclusion prior to determining whether the Policy even covers the siblings' counterclaims.
3. North Dakota Law Construing Insurers' Duty to Advance Costs
The duty to advance costs in a D & O Policy is treated virtually the same as the duty to defend, with the exception that the insurer is not required to control the litigation. Liberty Mut. Ins. Co. v. Pella Corp., 650 F.3d 1161, 1170 (8th Cir. 2011) (interpreting Iowa law but noting "state courts generally have viewed an insurer's duty to advance defense costs as an obligation congruent to the insurer's duty to defend" (quoting Federal Ins. Co. v. Sammons Fin. Grp., Inc., 595 F.Supp.2d 962, 976 (S.D. Iowa 2009) ) ). In *784 Tibert v. Nodak Mut. Ins. Co., 816 N.W.2d 31 (N.D. 2012), the North Dakota Supreme Court summarized its holdings construing insurers' duty to defend:
An insurer's duty to defend is broader than the duty to indemnify, and is generally determined by the allegations of the injured claimant. We have outlined the parameters of an insurer's duty to defend:
A liability insurer's obligation to defend its insured is ordinarily measured by the terms of the insurance policy and the pleading of the claimant who sues the insured. If the allegations of the claimant's complaint could support recovery upon a risk covered under the insurer's policy, a liability insurer has a duty to defend its insured. We have formulated the duty to defend to require a liability insurer to defend an underlying action against its insured if the allegations in the complaint give rise to potential liability or a possibility of coverage under the insurance policy.
When several claims are made against the insured in the underlying action, the insurer has a duty to defend the entire lawsuit if there is potential liability or a possibility of coverage for any one of the claims.
Any doubt about whether a duty to defend exists must be resolved in favor of the insured. Thus, when there is doubt whether the injured party's complaint states facts sufficient to bring the injury within the coverage of the insurance policy, and the claim "may or may not be covered by the policy," the insurer has a duty to defend. Only if there is no possibility of coverage is the insurer relieved of its duty to defend.
...
The duty to indemnify is premised upon the ultimate resolution of the underlying lawsuit and the actual basis for any liability of the insured. The duty to defend, however, arises as soon as the insured is sued, and accordingly is determined on the basis of the allegations in the injured claimant's complaint. Because the duty to defend is determined by the allegations in the complaint examined as of the time the complaint was served and the defense was tendered to the insurer, the ultimate result in the case does not affect the duty to defend.
Id. at 42-44 (citations and quotations omitted) (emphasis added).
H.O.M.E.'s D & O Policy requires National Security to pay or reimburse H.O.M.E. on a "current basis," for any "defense expenses" or "loss" incurred as a result of a covered "claim." D & O Policy 11, 22. Thus, per the North Dakota Supreme Court's guidance, Security National is liable "if the allegations in the complaint [of the underlying litigation] give rise to potential liability or a possibility of coverage" where any doubt is "resolved in favor of the insured" and Security National escapes liability only "if there is no possibility of coverage." Tibert, 816 N.W.2d at 42-43.
B. Whether the Siblings' Counterclaims Constitute a Covered Claim Under the D & O Policy
Beginning with the text of the D & O Policy, the sections titled "Insuring Agreements" A & B set forth the extent of the coverage for insured persons and the company, respectively:
A. The Insurer will pay on behalf of an insured person, loss that is a result of a claim for a management practices wrongful act first made during the policy period or during the Extended Reporting Period, if exercised, except to the extent that the company has indemnified the insured person for such loss.
B. The Insurer will pay on behalf of the company, loss that is the result *785 of a claim for a management practices wrongful act first made during the policy period or during the Extended Reported Period, if exercised, and for which the company has, to the extent required or permitted by law, indemnified any insured person.
D & O Policy 11. The meanings of the underlined terms, which as noted above are defined within the Policy, appear to be agreed upon except for the defined phrase "management practices wrongful act." In other words, there is no dispute over whether Lauris is an "insured person" or whether H.O.M.E. is the "company" referenced in the Insuring Agreements. Defs.' Mem. 11; Pl.'s Mem. 10-11. The parties agree that the siblings' counterclaims satisfy the Policy's definition of "claim" as used above. Defs.' Mem. 11; Compl. ¶ 81.
Thus the inquiry into whether H.O.M.E. is covered under the Policy depends on whether the siblings' counterclaim qualifies as a claim for a "management practices wrongful act," which the Policy defines, in relevant part, as:
[A]ny actual or alleged, misstatement, misleading statement, error or omission, or neglect or breach of duty by an insured person acting solely in their capacity as ... director, officer, trustee, member of an advisory board or committee, volunteer, organizer or employee of the company.
D & O Policy 15. The siblings' counterclaims alleging breach of fiduciary duty and fraud satisfy the first part of "management wrongful practices act"; it is the meaning of the phrase "acting solely in their capacity as ... director or officer" the parties contest. Pl.'s Mem. 15; Defs.' Mem. 6-8.
As discussed above, the siblings' nine claims arise from an event in 1993 in which they allege Lauris fraudulently induced them into the stock purchase agreement by misrepresenting the nature of certain provisions. Siblings' Countercl. 15-25. The counterclaims allege Lauris wore many hats, both in the company and outside of it, that gave rise to fiduciary duties. Id. Consequently, several of the claims are repetitive and assert the same actions as violating the duties imputed on him by virtue of his alleged positions. Id. For example, in Claim II the siblings allege Lauris breached the fiduciary duties he owed the three of them by virtue of his role as "a shareholder, officer, director, and controller of, and as an attorney representing H.O.M.E." Claims III and V allege the same behavior constituted a breach of Lauris's fiduciary duties as a trustee of various family trusts. Id. at 17-20. In Count IV, the counterclaims allege the same actions violated his duties as "an attorney providing legal advice" to the three of them. Id. at 19.
H.O.M.E. notes that two of the siblings' counterclaims (VI & VII) are based on North Dakota statutes applicable only to directors and officers and therefore argues the counterclaims allege misconduct solely in Lauris's capacity as a director. Defs.' Opp'n 6. It further argues Security National is putting "the cart before the horse" by treating the counterclaims as adjudicated facts. That is, just because the siblings have alleged multiple capacities ought not deprive Lauris of coverage-"it is enough that there is a potential coverage for some of the claims against Lauris." Id. at 7-8, 11. Finally, H.O.M.E. contends that recognizing Security National's argument would lead to absurd results; it would preclude coverage "anytime a claimant pleads alternative claims," or "mak[es] allegations of wrongful acts in any [other] capacity." Id. at 8. A director's coverage, H.O.M.E. posits, ought not hinge on the "panoply of claims" a plaintiff chooses to make. Id.
*786 Security National focuses on the use of the word "solely" to argue the counterclaims must seek relief for actions taken "exclusively and only" in a specified capacity in order to constitute a claim of a "management practices wrongful act." Pl.'s Mem. 15. Security National contends, "[t]he word 'solely' is not ambiguous or unclear. It ... does not contemplate or include the idea of concurrent or overlapping capacities." Id. It also points to the language in the definition which focuses on the underlying action of the insured person and not on the theory of liability. Pl.'s Opp'n 24. In short, because the siblings' counterclaims all rely on a "common course of conduct" without alleging any action that Lauris performed only as a director or officer of H.O.M.E., Security National argues the siblings do not claim a "management practices wrongful act" as defined in the Policy. Pl.'s Opp'n 24; Pl.'s Mem. 15.
There is no controlling North Dakota case interpreting a similar provision. In McAninch v. Wintermute, 491 F.3d 759 (8th Cir. 2007), however, the Eighth Circuit interpreted a similar provision, which limited liability coverage to losses "by reason of any Wrongful Act solely in their capacities of Director or Officer." Id. at 761-63. Applying Minnesota law (which does not appear to be inconsistent with North Dakota law in this respect), the Eighth Circuit held the insurer was liable because the underlying "indictment clearly alleges wrongful conduct against [the defendant] undertaken in her capacity as a director." Id. at 771. The McAninch panel explained its rationale:
We conclude that an insurer may not avoid its duty to indemnify for alleged wrongful conduct merely by arguing the director was also an owner, shareholder, etc., without some explanation as to how this dual capacity relates to or facilitated the wrongful conduct alleged. To hold otherwise would invite carriers to deny coverage based on factors unrelated to the risk underwritten.
Id. at 772. Because the insurer in McAninch did not explain how the director's "dual capacity" facilitated the alleged wrongdoing, other cases have seized on this distinction to distinguish McAninch. See, e.g., Carlson v. Twin City Fire Ins. Co., No. CIV. 09-608, 2009 WL 1793887, at *5 (D. Minn. June 23, 2009) (denying coverage because the director's wrongdoing was made possible by utilizing confidential information in a separate capacity). Relatedly, other jurisdictions apply a "but for" test, essentially looking to whether the covered claim could stand independently from the alleged conduct performed in a non-covered capacity. Langdale Co. v. National Union Fire Ins. Co. of Pittsburgh, Penn., 609 Fed.Appx. 578, 588 (11th Cir. 2015) ("Claims arise out of [t]he excluded conduct when 'but for' that conduct, there could be no claim against the insured." (quoting Langdale Co. v. National Union Fire Ins. Co. of Pittsburgh, Penn., 110 F.Supp.3d 1285, 1307 (N.D. Ga. 2014) ) ). Finally, some courts have looked to whether the director's actions were "inextricably intertwined" with a non-covered capacity. See, e.g., Yocum v. St. Paul Mercury Ins. Co., No. 5:09-CV-00123, 2010 WL 2179137, at *6 (E.D. Ark. May 27, 2010).
It is irrelevant in what capacity, if any, Lauris is ultimately found to have breached his fiduciary duties. See Homebank of Ark. v. Kansas Bankers Sur. Co., No. 4:06CV001670, 2008 WL 2704670, at *5 (E.D. Ark. July 7, 2008). As noted above, coverage claims are decided based entirely on the allegations in the underlying claim. Tibert, 816 N.W.2d at 44. The siblings allege Lauris (a licensed lawyer in North Dakota) or his law firm prepared the stock purchase agreement and that Lauris discussed its "legal implications" with them. Siblings' Countercl. ¶¶ 93-94. They also allege that they executed the agreement *787 "[i]n reliance on [Lauris's] legal advice and recommendation, and his omissions." Id. at ¶ 96. Further, because of Lauris's "representations of the legal impact" of the agreement, the siblings claim they believed they would continue to have a right of first refusal in case of a buyout. Id. at ¶ 97.
The facts in this case are more similar to Federal Sav. & Loan Ins. Corp. v. Mmahat, 97 B.R. 293 (E.D. La. 1988), in which the district court ruled that "Mmahat's dishonesty as director was an integral part of his dishonesty as a lawyer." Id. at 299. The Mmahat court ultimately denied coverage based on a different provision, but it concluded in dicta that "the losses here at issue cannot be said to have arisen solely from Mmahat's actions as director." Id.
Applying any number of the tests discussed above, it is impossible to extrapolate a claim against Lauris in which he acted "solely" as a director or officer for H.O.M.E. Unlike in McAninch, the siblings allege Lauris's capacity as a lawyer directly facilitated the breach of duties that he owed by virtue of his position as a director or officer. The allegations "inextricably intertwine" his role in providing legal advice with his role as a director and officer. Moreover, "but for" Lauris's legal training, his help preparing the agreement, and the legal advice he provided, it is difficult to understand the siblings' claims.
By disregarding the fact that the counterclaims all arise from the same event, H.O.M.E. conceptually attempts to place each claim in an individual silo in order to contend that the conclusion assumes adjudicated facts. This argument is unavailing, however, because even assuming that Lauris were ultimately found to have breached only his fiduciary duties as a director or officer, H.O.M.E. would still not have a case for coverage. This is because the underlying complaint not only alleges he simultaneously acted in noncovered capacities during all relevant times but also that these capacities aided the breach of his fiduciary duties as director and officer. In short, it is irrelevant whether Lauris breached his lawyerly fiduciary duties, the inquiry is whether the counterclaims allege he was acting as a personal lawyer or another capacity when he breached his duties as director and officer.
Although any ambiguity, "potential liability," or "possibility of coverage" is to be construed in favor of the insured, Tibert, 816 N.W.2d at 42-45, the court "will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage." North Dakota State Univ., 694 N.W.2d at 229.
C. Whether the Siblings' Counterclaims Are Excluded from Coverage under the Insured-versus-Insured Exclusion
Even were there some ambiguity with regard to H.O.M.E.'s coverage of the substance of the siblings' counterclaims (there is not) the counterclaims are nevertheless excluded from coverage under the IvI Exclusion. As noted above, it is not disputed that as a director of the Bank, Kristi Benz was, during all relevant times, an "insured person" under H.O.M.E.'s D & O Policy. Defs.' Mem. 12. The other two counterclaimants are not insured persons but the siblings' counterclaims were, again, filed jointly and no counterclaim is distinguishable or unique to any one sibling. Siblings' Countercl. ¶¶ 105-73. The D & O Policy's IvI Exclusion reads:
A. The insurer shall not be liable to make any payment for loss in connection with any claim based upon, arising out of, relating to, in consequence of, or in any involving:
...
20. any claim by, on behalf of, or at the behest of the company, any successor or trustee of the com pany *788 , affiliate of the company or any insured person in any capacity, except where such claim is brought and maintained:
a. in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a claim which is not otherwise excluded by the terms of the policy;
b. by an insured person solely as a customer of the company;
c. by a security holder of the company as a derivative action on behalf of the company or such affiliate;
provided such claim is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any insured or any affiliate of the company [.]
D & O Policy 17-18 (Section IV.A.20).
H.O.M.E. places great emphasis on the general purpose and intention of IvI exclusions, which it claims is to prevent collusive suits, and suggests the IvI Exclusion ought not apply in this case because there is no hint of collusion in the underlying litigation. Defs.' Mem. 15. Since ambiguity, under North Dakota law, is construed in favor of coverage, H.O.M.E. also points to the fact that Security National agreed to advance over $140,000 in costs as evidence of the IvI Exclusion provision's ambiguity. Id. at 13 n.4. H.O.M.E. further posits that finding no coverage is "illogical and contrary to the reasonable expectations of an insured director or officer." Id. at 14. Finally, it argues that Security National could have more clearly written the provision to exclude suits that were not brought "solely" by insured persons. Defs.' Opp'n 13-14.
Security National in turn relies on the exclusion's "plain terms" to show it bars coverage "for all loss 'in connection with' any claim 'relating to' or 'in any way involving' any claim by 'any insured person.' " Pl.'s Mem. 10. It breaks down the provision into four requirements that, if met, would exclude coverage:
(1) a "claim"-which is met here, otherwise "no coverage under the policy could be triggered in the first instance";
(2) "by, on behalf of, or at the behest of"-which is satisfied since "Kristi is named in, and seeks relief in, all nine counts of the counterclaim against her brother Lauris";
(3) "any insured person"-Kristi undisputedly qualifies; and
(4) the exceptions don't apply-none of the exceptions to the exclusion are relevant to the counterclaims nor are they asserted by H.O.M.E.
Id. at 11-12. Security National rejects H.O.M.E.'s contention that the provision could be written more clearly, accusing it of "confus[ing] clarity with exhaustive detail." Pl.'s Opp'n 10.
There appears to be no North Dakota case that has construed an IvI Exclusion provision, nor do parties cite to any controlling case law. Consequently, the Court is to apply the legal framework set forth above to interpret the exclusion and predict how the North Dakota Supreme Court would rule on this question. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ; cf. Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 937 (8th Cir. 2012).
In Jerry's Enterprises, Inc. v. U.S. Specialty Ins. Co., 845 F.3d 883 (8th Cir. 2017), the Eighth Circuit recently applied Minnesota law to a similar factual scenario. Id. at 887-88. H.O.M.E. emphasizes that Jerry's Enterprises does not apply North Dakota law but does not point to any differences between the Minnesota and North Dakota interpretation of insurance policies. Defs.' Opp'n 18. In fact, North Dakota and Minnesota appear to embrace similar approaches to interpreting coverage *789 exclusions. Compare Midwest Family Mut. Ins. Co. v. Wolters, 831 N.W.2d 628, 636 (Minn. 2013) ("An insurance policy must be construed as a whole, and unambiguous language must be given its plain and ordinary meaning." (citations omitted) ), and General Cas. Co. of Wis. v. Wozniak Travel, Inc., 762 N.W.2d 572, 575 (Minn. 2009) (holding exclusions are "narrowly considered" and construed in "favor of finding coverage"), with North Dakota State Univ., 694 N.W.2d at 229 ("We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction.... Exclusions from coverage in an insurance contract must be clear and explicit and are strictly construed against the insurer." (citations omitted) ).
In Jerry's Enterprises, the company's founder gifted shares to his three daughters and grandchildren. 845 F.3d at 885. The founder also specified in his estate plan that upon his death, his daughters would become directors of the company until their shares and the shares of his grandchildren were redeemed. Id. After his death, the plan was effectuated and Cheryl Sullivan, one of the founder's daughters, became a director. Id. She and two of her daughters (who were also gifted shares by their grandfather) disagreed with how the company was valuing their shares and brought suit against the company. Id. The suit was confidentially settled and then Jerry's Enterprises sought coverage for the costs of the settlement from its D & O liability insurer. Id. The insurer refused based primarily on the Policy's IvI Exclusion, since Sullivan, one of the three claimants, was an insured person-a fact that Jerry's Enterprises did not contest. Id. at 886-88. The IvI Exclusion Policy at issue there stated, in relevant part, that it excluded from coverage any claim:
[B]rought by or on behalf of, or in the name or right of ... any Insured Person, unless such Claim is: (1) brought and maintained independently of, and without the solicitation, assistance or active participation of ... any Insured Person....
Id. at 886. The Eighth Circuit held coverage was excluded under a "seemingly straightforward application of the exclusion clause." Id. at 888. It stated: "Here, the exclusion clause contains no ambiguity, and we must not read ambiguities into its language." Id.
H.O.M.E. mistakenly relies on differences between the last clauses in the exclusion in this case and the one in Jerry's Enterprises to argue that Security National could have adopted similar language to make the exclusion clearer. Defs.' Opp'n 18-19. Such reliance is misplaced; although the clauses use similar language, they serve distinct functions. A side-by-side comparison of the exclusions manifests these fundamental differences:
*790 ?
[Editor's Note: The preceding image contains the reference for footnote[4] ].
The language "assistance or active participation" constitutes an exception to the exclusion clause in Jerry's Enterprises but is an additional qualification to the exceptions in H.O.M.E.'s policy. That is, the language following the reference to "such claim" in H.O.M.E.'s D & O Policy is only invoked in and applies if the claim were otherwise excepted from the exclusion. None of the exceptions are relevant, nor does H.O.M.E. contend that they are.[5] Therefore, the only relevant comparison is to the language the Jerry's Enterprises court found actually to exclude coverage. H.O.M.E.'s D & O Policy in fact provides a narrower exclusion than the one quoted in Jerry's Enterprises-it applies not only to the claim itself but also to any "claim based upon, arising out of, relating to, in consequence of, or in any way involving" a claim by an insured person. D & O Policy 17-18 (Section IV.A.20). As both Minnesota and North Dakota courts recognize an insurance policy's plain meaning as controlling, there does not seem to be any daylight in arguing that the Eighth Circuit is not dispositive here since it concluded the exclusion in Jerry's Enterprises was clear on its face.
H.O.M.E. relies on a host of cases in other circuits that are distinguishable because they relied on an allocation clause to allocate the coverage for the loss between covered and uncovered matters. H.O.M.E.'s D & O Policy does not contain an allocation clause similar to those cited *791 in the other cases. The only type of allocation the policy contemplates is in the case that a claim is brought against both an insured person/entity and an uninsured person/entity, in which case the policy states the Insured and Insurer will agree to "a fair and proper allocation of all amounts" and sets forth the process by which the allocation will be determined. Nevertheless, H.O.M.E. asks this Court to analogize to this provision and allocate the loss of the uncovered matter (Kristi's claim) from the loss of a covered matter (Karna and Eric's claim).
H.O.M.E. invites this Court to apply some concerns raised by Judge Posner in interpreting an IvI Exclusion in Level 3 Communications, Inc. v. Fed. Ins. Co., 168 F.3d 956, 961 (7th Cir. 1999). As a threshold matter, most of Judge Posner's thoughts were dicta since the Seventh Circuit only concluded that coverage was excluded for the insured director but remanded to the district court to consider that policy's allocation clause, which contemplated allocation between "covered and uncovered matters." Id. at 960. It is also worth noting the "insured person" in Level 3 was added six months into the litigation, id. at 957 -a fact that other jurisdictions have found distinguishable. See, e.g., Sphinx Int'l, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 412 F.3d 1224, 1230-31 (11th Cir. 2005) (noting " Level 3 Communications is too different to be useful" since the insured person was merely a passive shareholder that joined the suit six months after it was filed and the language in the policies differ). The other cases to which H.O.M.E. cites all have allocation clauses between covered and uncovered matters or are not relevant for other reasons. See Vita Food Prod., Inc. v. Navigators Ins. Co., No. 16 C 08210, 2017 WL 2404981, at *8 (N.D. Ill. June 2, 2017) ("We accordingly apply the allocation clause to [Plaintiff]'s claim for coverage."); Home Fed. Sav. & Loan Ass'n of Niles v. Federal Ins. Co., No. 4:06-CV-3053, 2007 WL 2713060, at *4 (N.D. Ohio Sept. 14, 2007) (agreeing that "allocation provision explains how the policy will cover lawsuits that include both covered and uncovered matters"); Bodewes v. Ulico Cas. Co., 336 F.Supp.2d 263, 273 (W.D.N.Y. 2004) (examining coverage of an ERISA claim under a Trustee & Fiduciary Liability Policy and referring to cases involving D & O Policies as "neither entirely accurate nor entirely helpful").
H.O.M.E.'s assertion that Security National's willingness to provide temporary coverage is evidence of ambiguity is tantamount to disregarding its explicit reservation of rights. See Defs.' Mem. 13 n.4. H.O.M.E. states "nothing has changed" since Security National first decided to provide provisional coverage, id. at 6 n.2, but this ignores the state of the information before Security National when it made the provisional determination. Provisional coverage with a reservation of rights is a fairly common and recognized practice in North Dakota. See, e.g., K & L Homes, Inc., 829 N.W.2d at 727 ; Farmers Union Mut. Ins. Co. v. Decker, 704 N.W.2d 857, 868 (N.D. 2005).
Nor is the Court persuaded by H.O.M.E.'s attempt to invoke the "reasonable expectations" doctrine. The North Dakota Supreme Court has "expressly declined to adopt the doctrine of reasonable expectations" in the context of insurance policies. Huether v. Nodak Mut. Ins. Co., 871 N.W.2d 444, 448 (N.D. 2015) (quoting Nationwide Mut. Ins. Co. v. Lagodinski, 683 N.W.2d 903, 911-12 (N.D. 2004) ). Moreover, this doctrine would only apply if the language in the policy were found to be "sufficiently ambiguous." Id.
Finally, H.O.M.E.'s arguments that the IvI exclusion ought not be applied here because the underlying litigation is not collusive is undermined by other recognized *792 rationales for the exclusion. In Level 3, the case on which H.O.M.E. relies for its allocation argument, Judge Posner recognized that the IvI exclusion's purpose is also to prevent "suits arising out of those particularly bitter disputes that erupt when members of a corporate, as of a personal, family have a falling out and fall to quarreling." 168 F.3d at 958. As Security National points out, preventing coverage for family disputes is particularly appropriate in cases dealing with "closely-held family businesses." Pls.' Opp'n 21.
IV. CONCLUSION
For the foregoing reasons, the Court grants Security National's motion for summary judgment and denies H.O.M.E.'s motion for partial summary judgment. Judgment shall enter declaring that Security National is not obligated to provide coverage to H.O.M.E.
SO ORDERED.

Of the District of Massachusetts, sitting by designation.

Local Rules for the District of North Dakota permit parties moving for summary judgment to include statements of uncontested facts in narrative form within the memorandum supporting their motion. D.N.D. Civ. L.R. 7.1(A)(2). Accordingly, citations are to both parties' memoranda on points that are not contested.

All underlined terms have specially defined meanings within the D & O policy.

Jerry's Enterprises, Inc. v. U.S. Specialty Ins. Co., 132 F.Supp.3d 1128, 1132 (D. Minn. 2015).

Here, it is not contested that the three exceptions apply since Kristi did not bring the counterclaims in a derivative action or solely as a customer of the company and the counterclaims do not form part of a cross-claim of an otherwise excluded claim. D & O Policy 17-18 (Section IV.A.20).